# Illinois Official Reports

## Appellate Court

*People v. Holmes*, 2018 IL App (3d) 160060

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER M. HOLMES, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0060 |
| Filed | May 8, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Hancock County, No. 14-CF-36; the Hon. Richard H. Gambrell, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Alan M. Freedman, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Jason W. Pohren, State's Attorney, of Carthage (Patrick Delfino, Lawrence M. Bauer, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Presiding Justice Carter and Justice McDade concurred in the judgment and opinion. |

¶ 1    Defendant, Christopher M. Holmes, appeals from his conviction for aggravated criminal sexual abuse. Defendant argues (1) the circuit court improperly overruled defense counsel's objection to lay opinion testimony regarding defendant's intent and (2) the State failed to prove aggravated criminal sexual abuse beyond a reasonable doubt. We affirm.

¶ 2                                    FACTS

¶ 3    On May 19, 2014, the State charged defendant with the aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2014)) of M.S., a minor, who was at least 13 years of age but under 17 years of age. The cause proceeded to a jury trial.

¶ 4    M.S. testified that in May 2014, she lived with her mother, S.F.; two brothers, T.S. and G.S.; and defendant. Defendant and S.F. were married; defendant was her stepfather. At the time, M.S. was 16 years old. M.S. described her relationship with defendant as "typical." However, in early 2014, defendant's relationship with M.S. changed; M.S. no longer felt safe around defendant. In January 2014, defendant picked M.S. up by placing his hands under M.S.'s arms. Defendant swung M.S. in the air. While picking M.S. up, at least one of defendant's hands slid under M.S.'s shirt and touched an area under her bra. G.S. saw defendant's actions and seemed surprised. Defendant let go of M.S.; M.S. went to her room. G.S. told M.S. "that's not right" or "he's a pervert." M.S. initially did not take the incident seriously as she attributed defendant's inappropriate contact to an accident. After the incident, defendant began treating M.S. "overly nicely."

¶ 5    On the evening of May 17, 2014, M.S. ate dinner at her house with defendant and T.S. T.S. left the house after dinner. Defendant went to the lower-level laundry room. While T.S. was still at the kitchen table, defendant asked M.S. to come downstairs to help him with the laundry. This was unusual as each family member did their own laundry. Nevertheless, M.S. went to the laundry room and started a load of laundry in the washer. Defendant asked M.S., "Can you keep a secret?" M.S. responded, "It depends what it is." Defendant said M.S.'s response was not very convincing; defendant asked again if M.S. could keep a secret. M.S. eventually said "sure." Defendant then started pulling up the right side of her shirt. M.S. told defendant to stop and hit his hand away. When M.S. attempted to walk away, defendant grabbed her from behind and stuck his hands up her shirt. M.S. said both of defendant's hands were underneath her bra and touched her breasts. M.S. yelled at defendant to stop, and defendant replied in a sarcastic tone, "What am I doing?" M.S. yelled, " 'You're touching my F-ing breasts.' " M.S. broke away from defendant, ran upstairs, and locked herself in her bedroom. M.S. had left her cell phone on the kitchen table so she made a Facebook post asking if anyone had her mother's telephone number. While M.S. was attempting to get the telephone number, defendant knocked on her bedroom door and asked M.S. to finish the glass of milk that she had left on the table. At that point, approximately one hour had passed since M.S. ate dinner. M.S. responded, " '[o]bviously I'm not going to come out of the room. You just attacked me.' " M.S. heard defendant go into the bathroom, and she hurried to the kitchen to retrieve her cell phone and returned to her bedroom. M.S. sent a text message to S.F. regarding the incident asking her to come home. S.F. called M.S. and told her to call 911. S.F. then called defendant. M.S. overheard defendant denying the incident while speaking to S.F. on the telephone. M.S. called 911; she stayed in her bedroom until police arrived.

¶ 6       On cross-examination, M.S. clarified that defendant "firmly cupped" her breasts; he did not "squeeze" or "rub" them. M.S. occasionally had arguments with defendant regarding "typical parent stuff." M.S. had wanted to attend a festival in Chicago, but her biological parents would not let her go because of the lack of adult supervision. Defendant also did not want M.S. to go to the festival but her biological parents ultimately made the decision.

¶ 7       S.F. testified that, in 2014, she and defendant were married and lived together with her three children, T.S., M.S., and G.S. On May 17, 2014, S.F. worked at a nursing home from 2 p.m. to 10:30 p.m. Toward the middle of her shift, she received a text message from M.S. M.S.'s message was unusual in that she did not ordinarily contact her mother at work. In the message, M.S. asked S.F. to come home right away because defendant had attacked her. She sent a reply text that directed M.S. to " '[g]o to [her] room and be safe.' " S.F. then called defendant and said:

> " 'What the hell were you doing?' And [defendant] said, 'What do you mean?' And I said, 'Did you touch my daughter?' And [defendant's] exact words were, 'She never comes out of her room. How can I touch her?' And I said 'You're lying.' And I hung up."

M.S. overheard S.F.'s conversation with defendant; she sent S.F. a text message that said defendant was lying.

¶ 8       S.F. called M.S. after she got off the phone with defendant. M.S. sounded scared and did not exhibit her usual quiet demeanor. S.F. told M.S. to barricade herself in the room and call 911.

¶ 9       A few days later, M.S. explained the incident in greater detail to S.F. M.S. said that she was facing defendant when defendant put his hands up her shirt. S.F. later clarified, that M.S. said that defendant touched her breasts while standing behind her. S.F. acknowledged that she did not remember the exact details.

¶ 10      G.S. testified that M.S. was his older sister. In 2014, he lived with his mother, defendant, M.S., and his older brother, T.S. In January 2014, G.S. saw defendant pick M.S. up from behind and swing her in the air. G.S. noted M.S.'s "shirt was, like, this side up and [defendant's] hands were up here on her chest." M.S. jumped down and walked away. G.S. followed M.S. and told her that he thought defendant's actions "looked wrong." M.S. appeared upset and went into her bedroom and closed the door. G.S. said this incident was abnormal because defendant and M.S. previously did not associate with each other.

¶ 11      Warsaw Police Chief Wes Woolson, who was previously employed as police officer in the city where M.S. lived, testified that he responded to a 911 call placed by M.S. on May 17, 2014. At M.S.'s residence, defendant answered the door and directed Woolson to M.S.'s bedroom. Woolson announced his presence and asked M.S. to exit her bedroom to speak with him. M.S. hesitantly opened the door, and Woolson noticed that M.S. had been crying and appeared scared. M.S. told Woolson that she and defendant were doing laundry earlier in the evening when defendant "grabbed her from behind, put his hands under her shirt and under her bra next to her skin." M.S. told defendant to stop, and defendant responded, "What? What's wrong?" M.S. broke away from defendant, ran from the laundry room, and locked herself in her bedroom.

¶ 12      On cross-examination, Woolson clarified that M.S. said defendant placed his hands under her shirt, inside her bra, and touched her breasts. On redirect examination, the State asked:

"Q. Based on the circumstances that were presented to you from [M.S.], do you have any other reason to believe this defendant shoved his hand up her shirt and was holding her breast for any other reason other than sexual arousal?

A. No, ma'am."

Defense counsel objected to the State's question arguing that it called for speculation. The court overruled the objection. Then, on further redirect examination, the State asked:

"Q. In regards to whether she knew if he was sexually aroused or not, was there any questions you could think of to ask her about that?

A. No, I couldn't. It was—she was traumatized from the situation that was presented to me."

Defense counsel again objected. The court struck the question but allowed the State to reword it. The State asked:

"Q. Was there anything that you could think of to ask [M.S.] whether her stepfather was sexually aroused as he put his hands up her shirt and held her breasts?

A. No, ma'am.

Q. Did it seem obvious to you that that was for sexual arousal?"

Defense counsel objected to this question, and the State concluded its examination without pursuing a response.

¶ 13     During further recross-examination by defense counsel, Woolson stated that he did not ask M.S. if she noticed that defendant had an erection. Thereafter, the State asked Woolson if this was the only way to prove arousal. Woolson said it was not. Defense counsel objected to Woolson's answer, and the court overruled the objection. Woolson clarified that he would not have posed this type of question to M.S. as it was the type that the child advocacy specialists asked.

¶ 14     Defendant elected not to testify, and the case proceeded to closing arguments and deliberations. The jury found defendant guilty of aggravated criminal sexual abuse. Before the sentencing hearing, defendant filed a motion for new trial. In the motion, defendant argued that the evidence was insufficient to sustain his conviction beyond a reasonable doubt. The court denied the motion and, after conducting a sentencing hearing, imposed a sentence of 4 years' probation and 180 days in jail with credit for 92 days served. Defendant appeals.

¶ 15                                   ANALYSIS
¶ 16                              I. Opinion Testimony
¶ 17     Defendant argues the circuit court erred when it overruled defense counsel's objection to Woolson's opinion testimony regarding defendant's intent because it was not based on any personal observations and Woolson was not qualified as an expert. Defendant failed to preserve this issue because he did not raise it in a posttrial motion (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), but he argues that it is reversible plain error. We take no position on the propriety of Woolson's testimony because defendant cannot establish prejudice under either prong of plain-error analysis.

¶ 18     We may excuse defendant's procedural default of a substantial error

"(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant,

regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Sebby*, 2017 IL 119445, ¶ 48 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

We begin our analysis on whether defendant can demonstrate prejudice for reversal under the first prong of plain error. *People v. White*, 2011 IL 109689, ¶ 134 (reviewing court need not determine whether there was error where defendant cannot establish prejudice).

¶ 19        Defendant argues the alleged error is reversible under the first prong of plain-error review because the evidence was "so closely balanced that the error in Chief Woolson providing lay opinion testimony alone threatened to tip the scales of justice against [him]." To determine whether the trial evidence was close, we must examine the totality of the evidence and "conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 20        To convict defendant of aggravated criminal sexual abuse, the State must prove beyond a reasonable doubt that defendant (1) knowingly touched or fondled the breasts of the victim, (2) for the purpose of sexual gratification or arousal, (3) the victim was at least 13 years of age but under 17 years of age, and (4) defendant was at least 5 years older than the victim. 720 ILCS 5/11-0.1, 11-1.60(d) (West 2014). Generally, the intent element—defendant committed the act for the purpose of sexual gratification or arousal—cannot be proved by direct evidence. See *People v. Sanchez*, 292 Ill. App. 3d 763, 771 (1997). It is typically inferred from circumstantial evidence such as defendant's conduct. *In re Matthew K.*, 355 Ill. App. 3d 652, 655-57 (2005).

¶ 21        Defendant focuses his closely balanced argument on the evidence of the second element regarding his intent. Defendant contends the evidence of his intent to attain sexual gratification or arousal was derived from Woolson's opinion testimony and evidence of an uncharged incident that M.S. believed to be the result of an accident. Therefore, according to defendant, the evidence was closely balanced. We disagree.

¶ 22        Setting aside the opinion testimony at issue, we find that the evidence of defendant's intent was not close. As defendant notes, M.S. and G.S. testified to defendant's prior incident of inappropriate contact with M.S. Both witnesses indicated that defendant unexpectedly picked M.S. up and swung her in the air. M.S. further noted that defendant's hand touched an area under her bra. While M.S. initially believed that defendant's inappropriate contact was accidental, her belief dissipated as she noticed that her relationship with defendant changed. After the January 2014 incident, M.S. noticed that defendant treated her "overly nicely," and M.S. no longer felt safe around defendant. G.S.'s observation that defendant's actions were "not right" further dispel any suggestion that this inappropriate contact was accidental.

¶ 23        Four months after the swinging incident, when defendant and M.S. were alone in the house, defendant made the unusual request that M.S. help him with the laundry. Once in the laundry room, defendant suspiciously and repeatedly asked M.S. if she could "keep a secret." Once M.S. provided a satisfactory response, defendant attempted to reach up her shirt, and M.S. pushed defendant's hand away and attempted to walk away. Defendant then grabbed M.S., placed his hands under M.S.'s shirt and bra, and "cupped" M.S.'s breasts. When M.S. told defendant to stop, he sarcastically responded, "What am I doing?"

¶ 24    Together, this evidence readily established that defendant touched M.S.'s breasts for sexual gratification or arousal. Moreover, no other intent can be imagined from these facts. Were this a tort case, we would say "*res ipsa loquitur*." On these facts, the act is overwhelming evidence of the intent. Defendant was neither a physician conducting a medical examination of M.S. nor a tailor fitting M.S. for clothing. The jury could reasonably and readily infer from this evidence, without considering Woolson's testimony, that defendant had touched M.S.'s breasts for the purpose of sexual gratification or arousal. Applying "a qualitative, commonsense assessment of [the evidence] within the context of [this] case," we find that the evidence of intent is far from being closely balanced. *Sebby*, 2017 IL 119445, ¶ 53. Having found the evidence of intent overwhelming and no prejudice to defendant, we reject his first prong plain-error argument.

¶ 25    Defendant also argues that reversal is warranted under the second prong because the alleged error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). No! To obtain relief under the second prong, defendant must demonstrate "that the error was a structural error." *People v. Eppinger*, 2013 IL 114121, ¶ 19 (citing *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010)). "Structural errors are systemic, serving to ' "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." ' " *Thompson*, 238 Ill. 2d at 608 (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009), quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). Such errors render "a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Id.* at 609. Examples of structural error include the complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Id.* (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006)).

¶ 26    Defendant cites no case law holding the admission of improper lay opinion testimony is structural error. Moreover, we find that this alleged error did not erode the integrity of the judicial process or undermine the fairness of defendant's trial. Defendant's alleged error does not warrant reversal under the second prong of the plain-error analysis.

¶ 27                                    II. Sufficiency of the Evidence

¶ 28    Defendant argues the State failed to prove his guilt beyond a reasonable doubt because, excepting the allegedly erroneous testimony of Woolson, the State failed to introduce any evidence that defendant's act was done for the purpose of sexual gratification or arousal.

¶ 29    In a challenge to the sufficiency of the evidence, we apply the familiar standard from *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We draw all reasonable inferences from the evidence in favor of the prosecution and we will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses. *People v. Martin*, 2011 IL 109102, ¶ 15; *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). In determining defendant's guilt, the trier of fact may draw inferences that flow normally from the evidence before it. *Jackson*, 232 Ill. 2d at 281. However, the trier of fact need not search out all possible explanations consistent with innocence. *Id.* A defendant's

conviction is subject to reversal only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992).

¶ 30 Once again, defendant attacks only the sufficiency of the evidence of the intent element—the act was done for the purpose of sexual gratification or arousal. 720 ILCS 5/11-0.1, 11-1.60(d) (West 2014). As set forth above, no rational jury would have acquitted defendant, even without hearing the alleged improper lay opinion testimony.

¶ 31                                            CONCLUSION
¶ 32 For the foregoing reasons, we affirm the judgment of the circuit court of Hancock County.

¶ 33 Affirmed.