2023 IL App (4th) 210595

No. 4-21-0595

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 27, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Logan County |
| ROBERT M. HUNTER, | ) | No. 18CF238 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William G. Workman, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justice Lannerd concurred in the judgment and opinion.
Justice Steigmann specially concurred, with opinion.

**OPINION**

¶ 1   Following a jury trial, defendant, Robert M. Hunter, was convicted of aggravated criminal sexual abuse and sentenced to five years' imprisonment followed by two years' mandatory supervised release (MSR). Defendant now appeals, complaining about the admission of the other crimes evidence at his trial, as well as the absence of a particular jury instruction. In addition, defendant complains about a statutorily-mandated condition of his MSR prohibiting him from accessing social networking websites while on MSR. For the reasons that follow, we affirm defendant's conviction but vacate the complained-of MSR condition.

¶ 2                               I. BACKGROUND

¶ 3                                 A. Charges

¶ 4          In December 2018, the State charged defendant in Logan County case Nos. 18-CF-238 and 18-CF-239 with multiple criminal offenses based upon his alleged conduct with three different minors. The charges in case No. 18-CF-238 were based upon defendant's alleged conduct with A.S., while the charges in case No. 18-CF-239 were based upon defendant's alleged conduct with S.C. and J.M. As to the charges in case No. 18-CF-238, the State ultimately proceeded against defendant on one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) (count I) and two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)) (counts II and III). To support those charges, the State generally alleged, on or about November 6, 2018, that defendant, a person over the age of 17, committed various acts against A.S., a person under the age of 13, for the purpose of sexual gratification or arousal. Counts I through III respectively alleged defendant touched the vagina, chest, and buttocks of A.S.

¶ 5                          B. Pretrial Proceedings

¶ 6          In August 2019, the State filed motions in case Nos. 18-CF-238 and 18-CF-239, seeking to introduce certain evidence at defendant's trials, pursuant to sections 115-7.3 and 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3, 115-10 (West 2018)). As to the motions in case No. 18-CF-238, the State sought to introduce evidence of (1) out-of-court statements, allegedly made by A.S., pursuant to section 115-10 and (2) "other sexual offenses," allegedly committed by defendant pursuant to section 115-7.3. With respect to the latter, the State specifically sought to introduce evidence "that [defendant] engage[d] in the same course of conduct that is charged herein and committed [ ] acts of sexual conduct against S.C. and J.M., *** in that [ ] defendant touched the bodies of S.C. and J.M. for the purpose of sexual arousal or

gratification of [defendant]."

¶ 7      In February 2020, the trial court commenced a two-day combined hearing on the State's section 115-10 and section 115-7.3 motions filed in case Nos. 18-CF-238 and 18-CF-239. On the first day of the hearing, the State presented testimony from the mother of A.S., the grandmother of S.C. and J.M., and a representative from the Department of Children and Family Services (DCFS) who conducted forensic interviews of A.S., S.C., and J.M. In addition, the State presented audio and video recordings of the forensic interviews of the minors. Through the evidence presented, the trial court learned about defendant's alleged conduct with A.S., S.C., and J.M. Because the information gleaned from the evidence presented was largely consistent with the information gleaned from the evidence later presented at defendant's trial, we need not summarize that information here. Of note, however, the grandmother of S.C. and J.M. testified about one of the girls making an out-of-court statement about the other girl having to lay on top of defendant.

¶ 8      In March 2020, the trial court concluded the two-day combined hearing on the State's section 115-10 and section 115-7.3 motions filed in case Nos. 18-CF-238 and 18-CF-239. On the second day of the hearing, the parties presented argument in support of and against the State's motions. With respect to the section 115-7.3 motions, the State stated its intent to introduce evidence from case No. 18-CF-239 in case No. 18-CF-238 and vice versa "for propensity purposes." The parties' arguments concerning the admissibility of this evidence then focused on whether the circumstances of the alleged conduct with S.C. and J.M. were sufficiently similar to the circumstances of the alleged conduct with A.S. After hearing from the parties, the court ruled, in relevant part, "the evidence of Aggravated Criminal Sexual Abuse[ ] alleged in [case No. 18-CF-239] is admissible in [case No. 18-CF-238]." The court specifically found the circumstances of the alleged conduct in both cases were sufficiently similar. With respect to the section 115-10

motions, the State argued, in relevant part, that the out-of-court statements made by S.C. and J.M. in the presence of their grandmother were admissible both under section 115-10 and as excited utterances. Defendant disagreed, asserting, in part, the statements were not admissible as excited utterances because A.S. and J.M. "were not under any emotional distress" when discussing the alleged incident. After hearing from the parties, the court ruled it would "allow [the] testimony and statements to be entered." The court specifically found "[t]he time, content, and circumstances that [the out-of-court] statements were provided do show and provide sufficient safeguards of reliability to the statements that were made."

¶ 9                                    C. Jury Trial

¶ 10        In January 2021, the trial court conducted a jury trial in case No. 18-CF-238. The following is gleaned from the evidence presented.

¶ 11                          1. *The Initial Disclosure From A.S.*

¶ 12        In November 2018, A.S., who at the time was 10 years old, and her family attended Jefferson Street Christian Church in Lincoln, Illinois. On Tuesdays, A.S. attended an after-school daycare program called "Kid's Club" at First United Methodist Church in Lincoln. After Kid's Club, A.S. would go to Jefferson Street Christian Church to participate in a program called "Praise Handmaid." Praise Handmaid started at 5 p.m. A.S. required transportation to get from Kid's Club to Praise Handmaid.

¶ 13        Tara S., A.S.'s mother, testified she arranged for defendant to drive A.S. from Kid's Club to Praise Handmaid on November 6, 2018. Tara S. and her family were familiar with defendant, who at the time was 46 years old, from church. Tara S. acknowledged defendant would hug A.S. and hold her hand, and A.S. would occasionally sit on his lap. Tara. S. testified she asked defendant to pick A.S. up from Kid's Club around 4:45 p.m. on November 6. Video footage taken

from the building where Kid's Club operated was admitted into evidence. The video footage showed defendant entering the building at 3:53 p.m. and then leaving the building with A.S. at 3:57 p.m.

¶ 14    On November 13, 2018, Tara S. was informed of an accusation involving defendant and another family. Tara. S. then had a conversation with her daughter around 5:30 or 6 p.m. A.S.'s father was present during the conversation. Tara. S. testified she initially let A.S. know that she was not in trouble and that they loved her. Tara S. asked A.S. "if a man, woman, young, old, has anyone ever touched you in your girly parts or other private areas?" Tara S. explained what those terms meant in their family: "Private areas are, like, chest, behind, anything other than—girly parts are your vagina. That's sexual organ down below is girly parts. The other private areas would be the chest or your butt." Tara. S. testified A.S. responded by "whisper[ing] in my ear, yes." Tara. S. then "asked her who, and [A.S.] said, Robbie Hunter." Tara S. provided the following details about the remainder of the conversation:

> "I asked her if she had to do anything, and she said, No. I asked her if there was any kissing, anything like that, and she did kind of perk—like a kid caught with a cookie jar—kind of perked up and kind of body language of, yeah, that kind of happened, the embarrassed look on her face type, but she never verbalized that. But I took that as a, yes, on that[.]"

Tara. S. did not recall any other questions she asked of A.S. but asserted her questions did not "go into [the] details." When asked about A.S.'s body language and demeanor during the conversation, Tara S. testified: "Kind of hunched, kind of the head down, the embarrassed kind of look. It wasn't upright or anything. It was more of a—and she was whispering all of her answers. She didn't want

to verbalize loudly where dad could hear."

¶ 15    After the conversation, Tara S. and A.S.'s father reassured A.S. that she was not in trouble and that they loved her. They then told her they needed to go the hospital and she could choose if they went before or after Bible study. A.S. said she need to see her "Bible study family," so they went there first. After Bible study, they went to a hospital in Springfield, Illinois, arriving around 9 p.m.

¶ 16    2. *The Disclosure From A.S. During the Medical Examination*

¶ 17    Tara S. testified A.S. used a teddy bear, which was approximately 18 inches tall, to describe to medical staff at the hospital what happened to her. From Tara S.'s point of view, it seemed as if A.S. gave "a full sweep" of the front side of the teddy bear when giving her account. She did not make any gestures towards the back side of the teddy bear. Tara S. interpreted the hand motion as indicating the breasts and vaginal area. She did not recall if A.S. was asked if it was over or under the clothes or whether A.S. went into any more detail about the touching. When asked about A.S.'s body language and demeanor at the time, Tara S. testified A.S. was "anxious" but responded to the questions being asked of her.

¶ 18    Kelli Levek, an emergency medicine physician, testified about her examination of A.S. Dr. Levek testified A.S. provided the following history:

> "The patient had stated that someone had touched her in a place they weren't supposed to. When I asked where, she pointed to her chest and her genital region. I asked follow-up questions, including was the touching under or over the clothes, and she said over-the-clothes touch.
>
> I asked if there was any internal touching and described to

- 6 -

her, Was a finger or anything else put into you? And she said, No. I then asked questions regarding any concerning symptoms, including fevers, pain or burning with urination, vaginal discharge, vaginal bleeding, and any other pain or issues she was having, and she said, No, to those things."

Dr. Levek testified A.S. indicated she was touched only with a hand. Dr. Levek acknowledged A.S. was "very quiet" and used "mostly motions" to show where she had been touched. Dr. Levek testified A.S. made two separate motions. "She motioned across her chest, and then down in her genital region." Dr. Levek testified A.S. motioned towards her own body as opposed to a teddy bear. Based on the history provided, Dr. Levek completed a physical examination that did not include any internal examination or testing. The examination showed no abnormalities. Dr. Levek testified A.S.'s mother was asked to leave the examination room at some point. However, she also acknowledged her medical report did not reflect that event.

¶ 19        Kelly Belley, a registered nurse, testified about assisting Dr. Levek in the examination of A.S. Belley testified A.S. provided a statement indicating she had been touched and then showed her and Dr. Levek where she had been touched by using a teddy bear. Belley testified A.S. motioned her hand towards the chest and abdomen of the teddy bear. Belley also testified A.S. stated she had been touched under the clothes. When asked if A.S. indicated she was "touched either inside or outside her genitals," Belley testified, "She said it was an outside touch." When asked to describe A.S.'s demeanor and body language when she was asked to give a history and when she submitted to a physical examination, Belley testified, "Nervous, embarrassed, uncomfortable." Belley did not recall A.S.'s mother being asked to leave the examination room.

¶ 20        3. *The Disclosure From A.S. During the Forensic Interview*

¶ 21        On November 21, 2018, Tara. S. took A.S. to a forensic interview with a DCFS representative, Kelley Brooks. Before the interview, Tara S. told A.S. that other people wanted to talk to her about what had occurred and that she should tell those people anything she did not feel comfortable telling her parents. Tara S. testified she did not otherwise discuss the reported incident with her daughter. Brooks testified about how using open-ended questions when interviewing a child generally obtains "as much information from that child without us putting information into their head." The interview of A.S. by Brooks was audio and video recorded. The recording was admitted into evidence.

¶ 22        During the interview, A.S. reported "Robbie," who she knew from church, picked her from Kid's Club around 3:30 p.m. and then they drove in his blue truck to Kickapoo Creek Park. A.S. said the park had a football field and a white fence. After parking the truck, they watched a baking show called "*Nailed It*" on Robbie's tablet. At that point, Robbie used his hand to touch A.S.'s "butt" and "boobs." She explained he first reached under her shirt with his hand and touched her "boobs." He then "reached under" her underwear with his hand and touched her "butt cheek." At that point, she told him to stop, and Robbie stopped. A.S. stated Robbie did not ask her to touch any part of him. She also indicated no other part of Robbie's body touched her body. A.S. recalled Robbie changing out of his "work shirt" while at the park and into a "*Black Panther* sweatshirt." Throughout the video, A.S. can be seen holding a teddy bear and coloring. A.S. also appeared to be having a hard time explaining what happened to her and was using hand gestures to express herself.

¶ 23        4. *The Trial Testimony of A.S.*

¶ 24        A.S., who was 13 years old at the time of trial, testified that on November 6, 2018,

defendant drove her from Kid's Club to Praise Handmaid. It was the first occasion defendant had done so. After leaving Kid's Club but before going to Praise Handmaid, defendant drove her in a dark blue truck to Kickapoo Creek Park. Upon reaching the park, defendant drove past the third parking lot and then turned the vehicle around to face the parking lot. A.S. recalled seeing a white car with a woman on the phone nearby. The woman was "[m]aybe ten feet" away.

¶ 25    A.S. testified, once the vehicle was parked, "[w]e, like repositioned so that we could like watch the Netflix show, *Nailed It*, on the tablet." Defendant positioned the tablet on a few "boxes and stuff" and placed A.S.'s coat on the steering wheel "as, like, a pillow." A.S. then "laid on, like, his legs laying down and had my head on the steering wheel." A.S. provided the following account of what occurred next while watching the tablet: "I was laying down, and I had a tank top under my shirt, and he lifted them up, like, shoulder—past my shoulder, and he started to kiss my stomach, and, like, up to—like, up here, like upper chest. (Indicating)." She further testified, "Then he kissed my lips and tried to touch my butt under my pants, but I told him to stop, and he did." When asked to describe what she meant when she testified that he "tried to touch your butt," A.S. testified, "He was, like, reaching his hand under my pants." She explained defendant's hand did not go underneath her underwear but did go "[a] little bit" underneath her pants. When asked if he touched her over the clothes, she indicated, "He, like, touched my thigh with his hand, but I believe that is all." She explained defendant touched her thigh "[c]loser to the waist" as opposed to the knee and did so for "[m]aybe a minute." When asked how many times defendant touched or kissed her stomach and chest, A.S. testified, "A lot. I don't know exactly." When asked what she was doing when this was occurring, A.S. testified, "I was kind of watching the show, but at the same time, I was, like, confused and kind of, like, what should I do?"

¶ 26    A.S. explained the touching and kissing stopped when it was time for her to go to

Praise Handmaid. When asked if defendant changed his clothing, A.S. testified, "He did have, like, pants under his work pants, so he, like, took his work pants off, but he had pants under those." She also indicated she thought "he changed from his work shirt to just a regular shirt." They then went to the church, arriving a few minutes before 5 p.m.

¶ 27    About a week after the incident, A.S. told her mother what had occurred. Her mother had asked her questions, and A.S. answered with a "yes or no." She then went to the hospital. A.S. testified she answered the questions from the medical staff with a "yes or no." She then spoke with someone from DCFS about the incident. A.S. acknowledged she was having a hard time telling the DCFS representative what happened and indicated "it wasn't really registering what was going on because I was distracted by coloring."

¶ 28    On cross-examination, A.S. initially confirmed defendant had kissed her stomach. When asked if it was correct that defendant also kissed her shoulders, A.S. testified, "Not my shoulders—like, nipple area." When asked both if defendant touched her buttocks and if he stopped when she told him to do so, A.S. testified, "Yes." When asked if it was correct that defendant did not touch her vagina, A.S. testified, "Correct." A.S. testified *Nailed it* was a baking show. She acknowledged she did not leave defendant's vehicle while at the park.

¶ 29    A.S. was also asked on cross-examination about her prior statements about the incident. Her mother asked her if she had been touched in her girly parts, which meant to A.S. "[t]he breasts and vagina" but not the buttocks. A.S. again agreed defendant did not touch her vagina. A.S. acknowledged having a stuffed animal with her when speaking with the medical staff at the hospital but did not believe she used it to communicate. As for the conversation with the DCFS representative, A.S. testified she did not recall telling the representative that defendant touched her vagina but did recall stating he touched her breasts and buttocks with his hands. A.S.

also did not recall saying she could see a football field from where they were parked at the park. A.S. acknowledged football fields were not part of Kickapoo Creek Park but rather "a little ways down" in another area.

¶ 30                                    5. *The Other Crimes Evidence*

¶ 31            In November 2018, S.C. and J.M., cousins who were respectively eight and nine years old at the time, attended Jefferson Street Christian Church in Lincoln with their grandmother, Carolyn S. On Sundays, Carolyn S. participated in a Bible study at the church, while S.C. and J.M. participated in choir. The Bible study was held from 6 to 8 p.m., and choir was held from 6 to 7:15 p.m. Carolyn S. would usually leave the Bible study early to get her grandchildren. Defendant, a church member who had passed a background check to volunteer with middle school students, volunteered to watch the children of those who attended the Bible study. Carolyn S. used defendant's services on two occasions that month. During the first occasion, defendant watched S.C. and J.M., along with other children, in a classroom on the same floor of the church as the Bible study room. During the second occasion, which occurred on November 11, 2018, defendant watched S.C. and J.M., without any other children present, in a room of the church on a different floor from the Bible study room.

¶ 32            Carolyn S. testified when she went to pick up her grandchildren on the second occasion, she entered the room and observed defendant sitting in front of a computer with her grandchildren seated on each side of him. Carolyn S. believed defendant and her grandchildren were picking the movie *Black Panther* to watch. When asked where defendant's hands were positioned, she testified, "I can't recall exactly, but I know the impression I got was that they were—like, his arm was around them." She believed her grandchildren "might have been leaning, like, with maybe one leg up on him." She "wasn't real concerned" initially. Concerns arose after

she heard the conversation occurring between her grandchildren: "They were talking about how one of them had gotten a face rub, neck rub, back rub, leg rub, and the other one was, like, well, I only got a back rub and a neck rub." Defendant, who was still present in the room during the conversation, did not comment on it. This caused Carolyn S. "to feel a little weird." She then left the church with her grandchildren.

¶ 33 Carolyn S. testified her grandchildren continued to converse about the touching after they left the church and were in the car: "[T]hey were still talking about their different back rubs and neck rub and all of that, and—but the thing that I remember specifically was [S.C.] saying something about, I guess I kind of liked it, and I guess it felt kind of good when I had my belly rub." When then asked if either of her grandchildren mentioned something about layingl on top of defendant, Carolyn S. testified, "Yes. When [J.M.] was—when she was—they were talking about how [S.C.] got more than [J.M.], and [J.M.] said, That's probably just because you had to lay on top of him." Carolyn S. later confirmed, on cross-examination, "[J.M.] said to [S.C.], You probably got more rubs because you had to lay on top of him." Carolyn S. testified she "stayed quiet mostly" during the conversation and "just wanted to listen and hear what they were saying, what they were going to say." Carolyn S. testified her grandchildren seemed "very chatty," almost "giddy," when conversing about the touching.

¶ 34 After returning home, Carolyn S. felt "like there was something wrong." She contacted a member of the church, Nancy Otto, about the incident. She reported the incident to Otto and requested defendant's phone number. Carolyn S. then spoke with defendant by phone that night and expressed her concerns. Carolyn S. described defendant's response as follows:

> "He said—at one point he was trying to say that, like, that he felt
>
> like some kids need to know that all touching isn't bad, like—I

believe he said or I interpreted it, like, speaking or whatever like
that, and so he tries to basically be affectionate in touching with kids
and that he tries to not be inappropriate."

Carolyn S. testified defendant did not deny the touching. She did not remember if he ever described the touching to her.

¶ 35　　　　Nancy Otto, a team leader at Jefferson Street Christian Church, testified Carolyn S. contacted her on November 11 and made accusations about defendant's actions with her grandchildren. Otto acknowledged Carolyn S. indicated she was very concerned with defendant's actions but also did not want to get him in trouble. The next day, Otto conveyed the accusations to defendant and church elders. As for her conversation with defendant, Otto told defendant she "felt that it was inappropriate and probably bad judgment on his part." When asked how defendant responded to the information that she was confronting him with, Otto testified:

"Very openly. He—I didn't feel in my opinion that he, you
know, felt as if he had done anything wrong. He felt that—you
know, it was in recollection he said—basically had said that it was
probably bad judgment on his part to choose to go to the area of the
church that he had with only having, you know, a couple of children
and had expressed that he did not do anything, you know, with
negative connotations, that what he had done was—he felt was just
trying to be in a nurturing way."

Otto testified defendant did not deny the touching or convey any specifics about the touching.

¶ 36　　　　Michael Mallick, the senior minister at Jefferson Street Christian Church, testified that he learned of accusations against defendant on November 12 and then discussed those

accusations with church elders and defendant. As for defendant's account of what had occurred, Mallick initially testified as follows:

> "Well, pretty much that he was watching these girls, these two girls at our church, and that he was rubbing their legs, rubbing their belly, stroking their [hair], rubbing their face.
>
> And so—and I relayed to him, I said—and I can't remember which came first, if I had said to him, We have been told this, or he told us that. I can't remember, but I do know that when I asked him about this, about the touching of the girls, he didn't deny it. He said, Yeah, he said he was rubbing their bellies, rubbing their thighs, rubbing their back, rubbing their hair."

Mallick later testified, after having his memory refreshed on cross-examination, that defendant admitted to only rubbing the girls' backs and stroking their hair and faces. Mallick testified defendant did not go into any detail about whether the touching occurred over or under the clothing or which part of his body he used for the touching. Mallick testified defendant said, "I'm just— I'm affectionate." Mallick testified defendant admitted to being in the wrong for taking the girls to a room on the other side of the church without anyone else present. At the end of the meeting, Mallick informed defendant he would be contacting DCFS.

¶ 37      On November 21, 2018, Brooks, the DCFS representative who conducted a forensic interview of A.S., conducted forensic interviews of S.C. and J.M. The interviews were audio and video recorded. The recordings were admitted into evidence.

¶ 38      S.C., during her interview, stated the "church guy, Robbie," had watched her and J.M. on two occasions. On the first occasion, they, along with other children, watched a movie in

a room "upstairs," and Robbie laid out pillows for the children. Because S.C. did not have a pillow, Robbie offered for S.C. to lay her head on his shoulder. This made S.C. feel "uncomfortable," explaining she felt "nervous." On the second occasion, S.C. and J.M., without other children present, watched a movie "downstairs" in a room that had couches. She recalled the movie was "*Wild Cats*." Robbie provided the minors with ice cream sandwiches, drinks, and candy. S.C. and J.M. laid down on a couch on each side of Robbie. Robbie "started rubbing all over me and [J.M.]" This made S.C. feel "uncomfortable." S.C. explained Robbie rubbed her face, neck, and on top of her thigh over her pants. He also touched under her shirt on her back and stomach. S.C. stated Robbie touched her and J.M. "in the same spots." Because they were having issues with the movie, they decided to change it. At that point, her grandmother showed up.

¶ 39 J.M., during her interview, stated a man from her church had watched her and S.C. on two occasions at the church. On the first occasion, the man watched them, along with other children, in "his office." They watched a movie together. There were pillows for the children to lay on during the movie. The man laid in the middle, and S.C. was near the man. On the second occasion, J.M. and S.C., without other children present, watched a movie "downstairs." They watched the movie *Black Panther*. J.M., S.C., and the man sat together on a "brownish" couch during the movie. S.C. used a "greyish" blanket because she was cold. J.M. stated the man was "playing with [S.C.'s] hair" and "he was rubbing my back and rubbing S.C.'s." J.M. also stated the man only rubbed S.C.'s hair. Their grandmother arrived when the man was trying to change the movie. J.M. stated her grandmother "didn't know he kept rubbing our backs and stuff."

¶ 40 S.C., who was at the time of trial 10 years old, testified about occasions when a man who had black hair watched her and J.M. at church. On the last occasion, they were in "this basement place" watching a movie, *Black Panther*. Only the man, S.C., and J.M. were present.

The three of them laid on a couch, which S.C. believed was gray. S.C. testified the man, while watching the movie, started "rubbing me and my cousin in close places to areas." He used his hands to touch her thigh, back, shoulders, and stomach. Some of the touches occurred under the clothes. The man also played with her hair. The man did not touch her face or chest. S.C. observed the man touch her cousin in "[p]retty much the same places." She did not recall if the man played with her cousin's hair. She estimated the touching occurred for "[a]t least a couple minutes." The touching stopped after her grandmother arrived. S.C. testified she told her grandmother that the man rubbed her and "it was awesome." She later learned the touching was wrong. She was not laughing when she was being touched. The man did not say anything during the touching. The man did not make her touch him. She did not recall telling a DCFS representative that she was watching a movie called *Wild Cats*. S.C. acknowledged she was "probably" forgetting some of the details. She recalled having candy, ice cream, and soda while with the man. S.C. testified the man had touched her similarly on another occasion before this incident. On cross-examination, S.C. acknowledged that was the first time she was disclosing the prior occasion of similar touching.

¶ 41　　　　J.M., who was 12 years old at the time of trial, testified a man watched her and S.C. in November 2018. On one occasion, they went to a movie room in the church and watched *Black Panther*. The three of them sat together on a couch. She did not recall the color of the couch but believed it may have been black. When they sat down, the man "started rubbing us." J.M. remembered the man "starting off right here on my shoulder, and then he started rubbing my back and then my thigh. (Indicating.)" The man used his hand for the touching. The touching occurred over the clothes. Because she "felt kind of awkward," J.M. asked her cousin if she wanted to sit on chairs, to which S.C. agreed. At that point, the touching ended. When later asked to explain her response when she was being touched by the man, J.M. testified, "I was just sitting there because

- 16 -

I was, like, frozen. I didn't know what to do." J.M. testified she did not tell her grandmother that it felt good to be touched by the man. J.M. did not recall if the man said anything while he was touching her. J.M. testified she saw the man touch S.C.'s hair, back, and shoulder. She did not recall if her cousin laughed when being touched. She did not recall having candy but did recall having soda and an ice cream sandwich.

¶ 42                                      6. *Closing Arguments*

¶ 43        In closing arguments, defendant's trial counsel argued the State had not established defendant's guilt of the charged offenses beyond a reasonable doubt. In so arguing, counsel highlighted, in relevant part, the inconsistencies and vagueness in A.S.'s disclosures and testimony about the reported incident.

¶ 44                                      7. *Jury Instructions*

¶ 45        Following closing arguments, the jury was instructed pursuant to Illinois Pattern Jury Instructions, Criminal, No. 1.02 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 1.02), of the general principles regarding its role in assessing witness credibility and the various criteria to consider when making that assessment:

> "Only you are the judges of the believability of the witnesses
> and the weight to be given to the testimony of each them. In
> considering the testimony of any witness, you may take into account
> his ability and opportunity to observe, his age, his memory, his
> manner while testifying, any interest, bias, or prejudice he may have,
> and the reasonableness of his testimony considered in the light of all
> the evidence in the case."

The jury was not, however, instructed pursuant to Illinois Pattern Jury Instructions, Criminal, No.

11.66 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 11.66), of the principles regarding its role in assessing the out-of-court statements of A.S. and the various criteria to consider when making that assessment.

¶ 46                                              8. *Verdicts*

¶ 47            The jury, after its deliberations, found defendant guilty of count II, the count alleging the touching of the chest of A.S., but not guilty of counts I and III.

¶ 48                                    D. Posttrial Proceedings

¶ 49            In February 2021, defendant filed a motion for a new trial in case No. 18-CF-238, raising various complaints not pursued in this appeal. Following a hearing, the trial court denied defendant's motion and then sentenced him to five years' imprisonment, followed by two years' MSR. As a statutorily-mandated condition of his MSR, defendant is prohibited from accessing social networking websites while on MSR. Defendant later filed a motion to reconsider the sentence, again raising various complaints not pursued in this appeal. Following a hearing, the court denied defendant's motion.

¶ 50            This appeal followed.

¶ 51                                          II. ANALYSIS

¶ 52            On appeal, defendant complains about the admission of the other crimes evidence at his trial as well as the absence of a particular jury instruction. In addition, defendant complains about the statutorily-mandated condition of his MSR, prohibiting him from accessing social networking websites while on MSR. We address each of defendant's complaints in turn.

¶ 53                        A. The Admission of the Other Crimes Evidence

¶ 54            First, defendant complains about the admission of the other crimes evidence at his trial. Defendant initially argues none of the other crimes evidence should have been admitted

because the State did not sufficiently establish the alleged offenses against S.C. and J.M. Specifically, defendant asserts the State did not show his acts with S.C. and J.M. were done for the purpose of sexual gratification or arousal, an essential element for the offense of aggravated criminal sexual abuse. Defendant alternatively argues the other crimes evidence about J.M.'s out-of-court statement that S.C. had to lay on top of defendant should not have been admitted because it was hearsay and no exception to the rule against hearsay was applicable. Defendant acknowledges he has forfeited the issues related to the other crimes evidence by failing to adequately raise them below but requests the former be reviewed as a matter of plain error and ineffective assistance of trial counsel and the latter be reviewed as a matter of ineffective assistance of trial counsel.

¶ 55    The State, in response, argues defendant's complaints about the admission of the other crimes evidence are without merit. With respect to defendant's initial argument suggesting none of the other crimes evidence should have been admitted because the State did not sufficiently establish the offenses against S.C. and J.M., the State asserts (1) it is not required to establish all elements of an offense for evidence of that offense to be admissible and (2) even if it is required to establish all elements, the evidence it presented sufficiently established the offenses against S.C. and J.M. As to defendant's alternative argument suggesting the other crimes evidence about J.M.'s out-of-court statement should not have been admitted because it was hearsay and no exception to the rule against hearsay was applicable, the State asserts the statement was admissible as an excited utterance or, alternatively, under section 115-10 of the Code (725 ILCS 5/115-10 (West 2018)). The State further argues, even if either of defendant's complaints about the admission of the other crimes evidence had merit, the admission of the evidence does not result in plain error or ineffective assistance of trial counsel.

¶ 56 We begin with defendant's argument suggesting none of the other crimes evidence should have been admitted because the State did not sufficiently establish the offenses against S.C. and J.M. Prior to trial, the State sought, and the trial court allowed, the introduction of the other crimes evidence for propensity purposes pursuant to section 115-7.3 of the Code (*id.* § 115-7.3). Section 115-7.3 provides, when a defendant has been charged with certain sex offenses (including predatory criminal sexual assault of a child and aggravated criminal sexual abuse), evidence of that defendant's commission of certain other sex offenses (including aggravated criminal sexual abuse) may be admissible for its bearing on any matter to which it is relevant, including propensity to commit the charged sex offenses. *Id.*; see also *People v. Donoho*, 204 Ill. 2d 159, 176, 788 N.E.2d 707, 718 (2003) ("[T]he legislature enacted section 115-7.3 to enable courts to admit evidence of other crimes to show defendant's propensity to commit sex offenses if the requirements of section 115-7.3 are met.").

¶ 57 In support of his argument, defendant relies upon *People v. Thingvold*, 145 Ill. 2d 441, 584 N.E.2d 89 (1991). In that case, our supreme court stated, albeit outside the context of section 115-7.3 of the Code, "the State must first show that a crime took place and that the defendant committed it or participated in its commission" before other crimes evidence may be admitted against the defendant. (Emphasis omitted.) *Id.* at 455. The court further stated proof the defendant committed the crime or participated in its commission need not be established "beyond a reasonable doubt" but "such poof must be more than a mere suspicion." *Id.* at 456.

¶ 58 Setting aside the State's initial assertion that it is not required to establish all elements of an offense for evidence of that offense to be admissible, we conclude the evidence the State presented sufficiently established the offenses against S.C. and J.M. for evidence of those offenses to be admissible for propensity purposes under section 115-7.3 of the Code. Again,

defendant asserts the State did not sufficiently establish the alleged offenses of aggravated criminal sexual abuse against S.C. and J.M. because it did not show his actions with S.C. and J.M. were for the purpose of sexual gratification or arousal. See 720 ILCS 5/11-1.60(c)(1) (West 2018). Determining whether an act was committed for the purpose of sexual gratification or arousal is, as defendant acknowledges, typically inferred from circumstantial evidence. *People v. Holmes*, 2018 IL App (3d) 160060, ¶ 20, 103 N.E.3d 1035.

¶ 59 The evidence showed defendant moved S.C. and J.M., without any other children present, to a room of the church on a different floor from where their grandmother was located. He then, once there, began rubbing the minors' bodies. The reports of the rubbing included the face, neck, back, stomach, thigh, and hair. When the minors were later conversing about the rubbing in the presence of their grandmother and defendant, defendant did not comment on the minors' conversation. We find it can be reasonably inferred from these circumstances that defendant's actions were for the purpose of sexual gratification or arousal. Defendant cites cases where reviewing courts found the requisite criminal intent based upon additional circumstances not presented here (such as observable signs of arousal or sexually explicit comments by the accused). See, *e.g.*, *In re M.H.*, 2019 IL App (3d) 180625, ¶ 17, 127 N.E.3d 1146. However, those cases do not preclude the reasonable inference of defendant's criminal intent in this case, particularly given that the evidence was being evaluated for admissibility under section 115-7.3. The evidence the State presented sufficiently established the alleged offenses of aggravated criminal sexual abuse against S.C. and J.M. Accordingly, we reject defendant's argument that none of the evidence of his alleged offenses against S.C. and J.M. should have been admitted.

¶ 60 We next consider defendant's argument suggesting the other crimes evidence about J.M.'s out-of-court statement that S.C. had to lay on top of him should not have been admitted

because it was hearsay and no exception to the rule against hearsay was applicable. Section 115-7.3(b) of the Code (725 ILCS 5/115-7.3(b) (West 2018)) requires evidence that a defendant committed another sex offense be "otherwise admissible under the rules of evidence." "Thus, evidence that is normally inadmissible, such as hearsay evidence, remains inadmissible" under section 115-7.3. *People v. Childress*, 338 Ill. App. 3d 540, 551, 789 N.E.2d 330, 339 (2003).

¶ 61 Defendant initially, in reply to the State's argument before this court, contends the State has forfeited its argument that the complained-of statement was admissible as an excited utterance because the State raises it "for the first time on appeal." We reject defendant's contention. To begin with, defendant never presented any hearsay objection to the other crimes evidence after the State sought to admit said evidence pursuant to section 115-7.3. Moreover, the State argued, albeit when addressing its section 115-10 motions, that the out-of-court statements made by J.M. in the presence of her grandmother were admissible as excited utterances. Under these circumstances, we find defendant's contention unconvincing.

¶ 62 Illinois Rule of Evidence 803(2) (eff. Sept. 28, 2018) provides that an excited utterance is admissible as an exception to the rule against hearsay. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* "The theory underlying the exception is that the event is so startling that it 'temporarily stills the capacity for reflection, thus producing statements free of conscious fabrication.' " *People v. Abram*, 2016 IL App (1st) 132785, ¶ 71, 50 N.E.3d 1197 (quoting *People v. Harris*, 134 Ill. App. 3d 705, 711, 480 N.E.2d 1189, 1194 (1985)). When determining whether a statement qualifies as an excited utterance, " 'courts consider the totality of the circumstances, including: the time elapsed between the event and the utterance, the

nature of the event, the declarant's mental and physical condition, and the presence of self-interest.' " *Id.* (quoting *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 44, 957 N.E.2d 142).

¶ 63　　　　Defendant asserts J.M.'s statement was not admissible as an excited utterance because there was not an occurrence sufficiently startling to produce a spontaneous and unreflecting statement. The evidence showed 9-year-old J.M. experienced an incident where defendant, a man who was 46 years old at the time, took her and her 8-year-old cousin to a room of the church on a different floor from where their grandmother was located and then repeatedly rubbed the bodies of both girls. Carolyn S. described her grandchildren as being "very chatty," almost "giddy," after the incident. J.M. later testified the rubbing made her feel "kind of awkward," explaining, "I was just sitting there because I was, like, frozen. I didn't know what to do." Based on the evidence presented, we find there was an occurrence sufficiently startling to produce a spontaneous and unreflecting statement. The statement, which was undisputedly made shortly after and in relation to the reported incident, was admissible as an excited utterance. We therefore need not consider whether the statement was also admissible under section 115-10 of the Code. Accordingly, we reject defendant's argument, suggesting the other crimes evidence about J.M.'s statement should not have been admitted.

¶ 64　　　　In summary, we find, as the State has argued, defendant's complaints about the admission of the other crimes evidence at his trial are without merit. Therefore, the admission of the other crimes evidence did not result in plain error or ineffective assistance of trial counsel.

¶ 65　　　　　　　　B. The Absence of a Particular Jury Instruction

¶ 66　　　　Next, defendant complains about the absence of a particular jury instruction. Defendant argues the jury should have been instructed, pursuant to IPI Criminal No. 11.66, because the State presented A.S.'s out-of-court statements about the charged offenses under

section 115-10 of the Code (725 ILCS 5/115-10 (West 2018)). Defendant acknowledges he has forfeited this issue by failing to raise it below but requests it be reviewed as a matter of plain error and ineffective assistance of trial counsel.

¶ 67　　　　The State, in response, concedes defendant's complaint about the absence of a jury instruction has merit. That is, it acknowledges the jury should have been instructed pursuant to IPI Criminal No. 11.66 under the circumstances presented. The State argues, however, the absence of the jury instruction does not result in plain error or ineffective assistance of trial counsel because the evidence was not closely balanced and because defendant was not prejudiced by the absence of the instruction.

¶ 68　　　　Section 115-10 of the Code (*id.*) permits, amongst other things, the admission of certain out-of-court statements of a child in those cases involving the sexual abuse of a child. When a statement is admitted under section 115-10, the statute requires the trial court to

> "instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." *Id.* § 115-10(c).

IPI Criminal No. 11.66 implements this statutory provision. Our supreme court has found it to be clear and obvious error for a jury to not be instructed in accordance with section 115-10 when a statement is admitted under that section. *People v. Sargent*, 239 Ill. 2d 166, 190, 940 N.E.2d 1045, 1059 (2010). Because A.S.'s out-of-court statements were admitted under section 115-10, the jury should have been instructed pursuant to IPI Criminal No. 11.66. Accordingly, we accept the State's concession of error.

¶ 69    To support his claim that the absence of the jury instruction resulted in plain error and the ineffective assistance of trial counsel, defendant asserts (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against him and (2) there is a reasonably probability the outcome of his trial would have been different had his trial counsel assured the jury was properly instructed. See *People v. Sebby*, 2017 IL 119445, ¶ 51, 89 N.E.3d 675 (addressing claims of first-prong plain error); *People v. Veach*, 2017 IL 120649, ¶ 30, 89 N.E.3d 366 (addressing claims of ineffective assistance of counsel).

¶ 70    The jury found defendant guilty of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1) (West 2018)) based upon his alleged touching of the chest of A.S. The evidence at trial showed defendant, contrary to the directions of A.S.'s mother, picked A.S. up from Kid's Club about an hour before she had to be at Praise Handmaid. About a week later, A.S. made a statement to her mother indicating defendant touched her on her "girly parts or other private areas," locations which included the chest, and then another statement to medical staff indicating she was touched on her chest. Then, about another week later, A.S. made a statement to a forensic interviewer indicating defendant touched her on her chest. Finally, during the January 2021 trial, A.S. testified defendant touched her on her chest. Not only did A.S. consistently indicate she was touched on her chest by defendant, but the other crimes evidence showed defendant's propensity to commit such an act.

¶ 71    While there were some inconsistencies and vagueness in A.S.'s disclosures and testimony, we do not find they rise to the level of rendering the evidence closely balanced with respect to whether defendant committed the offense for which he was found guilty. *Cf. People v. Mitchell*, 155 Ill. 2d 344, 354, 614 N.E.2d 1213, 1217 (1993) (finding the evidence was closely balanced given the improperly admitted "highly prejudicial testimony" and "serious

- 25 -

contradictions" in the child's testimony). Moreover, defendant's trial counsel highlighted the inconsistencies and vagueness to the jury. We further note the jury, although not instructed of the principles regarding its role in assessing A.S.'s out-of-court statements and the various criteria to consider when making that assessment, was instructed of similar principles regarding its role in assessing witness credibility and the various criteria to consider when making that assessment, including the age of the witness. See *People v. Marcos*, 2013 IL App (1st) 111040, ¶ 70, 995 N.E.2d 446 ("[W]hen deciding whether the evidence was closely balanced for purposes of plain error review, a reviewing court may place the hearsay outcry statements on the prosecution's side of the scale, if the trial court had cautioned the jury about a witness's 'age' in an instruction based on IPI Criminal 4th No. 1.02, although it had erroneously omitted IPI Criminal 4th No. 11.66.").

¶ 72 Under the circumstance presented, we find the evidence is not closely balanced and there is no reasonable probability the outcome of the trial would have been different had defendant's trial counsel assured the jury was properly instructed pursuant to IPI Criminal No. 11.66. Accordingly, we conclude the absence of the jury instruction did not result in plain error or ineffective assistance of trial counsel.

¶ 73 C. The Lawfulness of a Statutorily-Mandated MSR Condition

¶ 74 Last, defendant complains about a statutorily-mandated condition of his MSR, prohibiting him from accessing social networking websites while on MSR. Defendant argues the condition violates the first amendment (U.S. Const., amend. I). Defendant acknowledges he did not raise the issue below but notes a statute's constitutionality may be challenged at any time.

¶ 75 The State, in response, concedes defendant's complaint about the statutorily-mandated condition of his MSR has merit. That is, it acknowledges, pursuant to established case

law, the MSR condition violates the first amendment. The State further does not refute defendant's suggestion that the issue is properly before this court for review.

¶ 76      In *People v. Galley*, 2021 IL App (4th) 180142, 172 N.E.3d 600, this court addressed the lawfulness of section 3-3-7(a)(7.12) of the Unified Code of Corrections (730 ILCS 5/3-3-7(a)(7.12) (West 2016)), the statutory provision setting forth the condition prohibiting persons convicted of certain sex offenses from accessing social networking websites while on MSR. After our review, we concluded section 3-3-7(a)(7.12) was overbroad and facially unconstitutional. *Galley*, 2021 IL App (4th) 180142, ¶ 27. Consequently, we vacated the condition of the defendant's MSR that was based on section 3-3-7(a)(7.12). *Id.* ¶ 30.

¶ 77      In accordance with *Galley*, we find the condition of defendant's MSR, prohibiting him from accessing social networking websites while on MSR, is subject to vacatur.

¶ 78                    III. CONCLUSION

¶ 79      For the reasons stated, we affirm defendant's conviction but vacate the condition of defendant's MSR prohibiting him from accessing social networking websites while on MSR.

¶ 80      Affirmed in part and vacated in part.

¶ 81      JUSTICE STEIGMANN, specially concurring:

¶ 82      Although I fully agree with the result reached by my distinguished colleagues in the majority, I specially concur because this court should use this case to point out that *People v. Hayden*, 2018 IL App (4th) 160035, was wrongly decided and should not be followed.

¶ 83      In *Hayden*, the majority erroneously held that, although a child victim of a sex offense could testify as a propensity witness pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)) about the sexual assault or abuse she experienced, her out-of-court statements regarding that offense would be *inadmissible* because the hearsay exception in section

115-10 (*id.* § 115-10) applies only to statements of the victim of the charged offense and not to the statements of the victim of the propensity offense. *Hayden*, 2018 IL App (4th) 160035, ¶ 120. As I noted in my dissent in that case, the majority's conclusion "rests almost entirely upon the use of the singular term '*the* victim' in [section 115-10(a)(1)] when it was enacted in 1983." (Emphasis added.) *Id.* ¶ 190 (Steigmann, J., dissenting). As I wrote then and still maintain, "That is much too thin a reed to support reversing the multiple convictions *** and to require as a result that these young victims testify yet again." *Id.*

¶ 84    In this case, the potential damage of *Hayden* once again rears its ugly head. If the trial court here had concluded that the excited utterance exception did not apply to statements of the propensity witnesses, that court would have been required to follow *Hayden* and to conclude that evidence of the propensity child victim's out-of-court statements could not be admitted. Had the trial court so ruled, critical information that the trier of fact was entitled to hear would not have been admitted.

¶ 85    Experience suggests that many cases exist in which the excited utterance exception would not apply, thus requiring trial courts—against their better judgment—to follow the flawed decision in *Hayden*. At some point, a panel of this court or another district of the appellate court— or the supreme court—will conclude that *Hayden*'s interpretation of section 115-10 is wrong. Until that occurs, trial courts will be compelled to apply *Hayden*'s incorrect construction.

¶ 86    As I explained in my dissent, the legislature intended sections 115-7.3 and 115-10 to be read expansively, and not restrictively, so as to increase the evidence available to the trier of fact in prosecutions involving the sexual assault of children. *Id.* ¶¶ 157-71. Sections 115-10 and 115-7.3 were enacted to address concerns unique to these types of cases. Specifically, section 115-10 was "originally passed in response to the difficulty in convicting persons accused of sexually

assaulting young children"—namely, "[p]roblems in proof [resulting] when the lesser developed cognitive and language skills that *** hinder [children] in adequately communicating the details of an assault." *People v. Holloway*, 177 Ill. 2d 1, 9, 682 N.E.2d 59, 63 (1997). And section 115-7.3 was intended to address the propensity of sex offenders to repeat their crimes by allowing the fact finder to use evidence of repeat offenses to achieve the ends of justice and help protect society. *Donoho*, 204 Ill. 2d at 173-74, 788 N.E.2d at 716-17. q

¶ 87        I emphasize that *Hayden* is not just wrong, but *harmfully* wrong. Because child victims often have difficulty conveying the details of their sexual assault or sexual abuse to a roomful of strangers at a jury trial, the legislature enacted both sections 115-10 and 115-7.3 to ensure that the trier of fact receive the probative evidence needed to determine what was done to those victims. *Hayden* directly frustrates this purpose.

¶ 88        One day, this court's erroneous decision in *Hayden* will no longer be deemed good law. Nonetheless, because my distinguished colleagues in the majority did not seize the opportunity to use this case as a first step toward that important goal, I must respectfully—and regrettably—specially concur.

## *People v. Hunter*, 2023 IL App (4th) 210595

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Logan County, No. 18-CF-238; the Hon. William G. Workman, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Christopher L. Gehrke, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Bradley M. Hauge, State's Attorney, of Lincoln (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |