2025 IL App (2d) 240055-U
No. 2-24-0055
Order filed March 31, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-1790 |
| SUBAHAR SABAPATHY, | ) ) | Honorable David C. Lombardo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The victim's testimony alongside other crimes evidence was sufficient to convict defendant of aggravated criminal sexual abuse; the trial court did not abuse its discretion in admitting other crimes evidence; the trial court's finding that defendant had been advised by trial counsel regarding his right to testify was not against the manifest weight of the evidence; and trial counsel was not ineffective for failing to further investigate additional defenses or present expert testimony. Affirmed.

¶ 2    Defendant Subahar Sabapathy appeals his conviction of aggravated criminal sexual abuse

(720 ILCS 5/11-1.60(c)(1)(i) (West 2010)) arising from an incident in 2011 where he groped 12-

year-old V.K. while staying with her family for Christmas. On appeal, defendant challenges the

sufficiency of the evidence, argues that the trial court abused its discretion in admitting other crimes evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2022)), and argues that he received ineffective assistance of counsel in that trial counsel failed to advise him of his right to testify, failed to investigate potential defenses, and failed to present expert testimony to refute the other crimes witness. For the following reasons, we affirm.

¶ 3                              I. BACKGROUND

¶ 4                           A. Familial Background

¶ 5     Defendant had been married to V.K.'s father's sister (hereinafter V.K.'s aunt), before she passed away in 1998. Defendant and V.K.'s aunt had a son together (hereinafter defendant's son). At the time of the abuse to V.K., defendant had remarried but was divorced at the time of the trial (hereinafter defendant's wife or ex-wife). Defendant's ex-wife had a daughter (M.R.) from a previous relationship.

¶ 6              B. Motion *in Limine* to Admit Other Crimes Evidence

¶ 7     On March 14, 2023, the State filed a motion *in limine* seeking to admit other crimes evidence pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) and section 115-7.3 of the Code. The motion sought to introduce evidence that defendant sexually abused his stepdaughter, M.R., beginning when she was in fourth grade, approximately 10 years old in approximately 2005. The abuse continued until M.R. was approximately 17-18 years old in approximately 2012-13. M.R. reported that defendant would place his hand in her shirt and touch her breasts with his hands, would digitally penetrate her vagina, and rub his erect penis against her buttocks through his underwear. These incidents occurred when M.R. and defendant lived in Japan, Florida, and Virginia.

¶ 8    Additionally, R.S. was the daughter of a friend defendant knew from college. She disclosed that just after Christmas 2003, when she was 11 years old, defendant and his family came to visit her father in New Jersey. While her father was at his computer conducting a video call, defendant was standing next to R.S. She reported that defendant placed his hand up her shirt and groped her breasts over her bra. R.S. then pulled away from defendant and went into the other room. She returned to the room with defendant and he placed his hand inside her shirt and inside her bra, touching her breasts with his hand.

¶ 9    A hearing was held on the State's motion on April 19, 2023. The trial court granted the motion in part and denied it in part, allowing for the admission of evidence regarding the victim R.S. for the limited purpose of propensity. In finding that R.S.'s testimony was admissible, the trial court emphasized the similarities in age and status of the victims, as well as the nature of the abuse. However, in finding M.R.'s testimony inadmissible, the court explained that the abuse to M.R., while similar in some ways, was "extraordinarily more prejudicial."

¶ 10                                    C. Bench Trial

¶ 11   The case proceeded to a bench trial on August 1, 2023. The following evidence was presented at trial.

¶ 12   V.K. testified as follows. Around Christmastime 2011, she was 12 years old. She lived in Buffalo Grove with her parents and older brother. V.K. described their home as a two-story single-family house. Her bedroom was on the second floor on the right-hand side when coming up the stairs. Her bedroom was near the bathroom and her brother's room. The master bedroom was on the left-hand side when coming up the stairs.

¶ 13   That year, V.K.'s uncle, her father's older brother, hosted a Christmas party at his home, which was within walking distance of V.K.'s home. Her family, defendant's family, and

approximately 18 other families attended the party. The party lasted for at least three days with people coming and going. V.K. attended all three days of the party.

¶ 14    Defendant, his then-wife, and M.R. flew into town from somewhere on the east coast to attend the party and stayed with V.K.'s family while they were visiting. V.K.'s father picked defendant and his family up from Midway airport around December 23 or 24, 2011. V.K. had never met defendant or his family before.

¶ 15    When V.K. first met defendant, he commented that she looked like V.K.'s aunt. Defendant and his family then went and got ready to go to the party. They all drove to the party and stayed from midday until 9:45 p.m. or 10:30 p.m. They all returned to V.K.'s home around 10:45 p.m.

¶ 16    When they got back to V.K.'s home, everyone started getting ready for bed. The sleeping arrangements were that defendant and his wife slept in V.K.'s brother's room, V.K. and M.R. slept in V.K.'s room, and V.K.'s brother slept in the master bedroom with V.K.'s parents. As everyone was getting ready for bed, V.K. was in her room, her parents were downstairs, and M.R. had left to put her pajamas on. Defendant came into V.K.'s room saying he wanted to see the art she had made. Defendant had changed into his pajamas, which were white and black checkered with a short sleeve collared shirt and long pants. V.K. was still wearing what she had worn to the party.

¶ 17    V.K.'s room was around 10 by 12 feet in size. The room had books, a sliding closet door, a desk near the door, a twin-sized bed and another twin-sized mattress for M.R. V.K. stepped aside to let defendant into the room. Defendant looked around the room and commented about how her books were disorganized and how V.K. resembled her aunt. Defendant closed the door, saying he wanted to look at some of V.K.'s artwork, which the door was blocking.

¶ 18    After closing the door, defendant locked it. Defendant then asked V.K. for a hug. V.K. testified that she may have nodded, but she did not raise her arms to hug defendant. Defendant

placed his arms around V.K.'s back over her clothes. Defendant then moved his hands under V.K.'s shirt touching her back, then moved them around her front, touching her stomach. Defendant then grabbed and groped V.K.'s breasts. In response, V.K. froze; she did not scream or push him away and just stared at the door. Defendant did not say anything as this happened. V.K. testified that she felt violated.

¶ 19 Defendant stopped when V.K.'s mother called his name from downstairs. Defendant opened the door and walked out without saying anything. M.R. later came to the room to go to sleep. V.K. thought about asking M.R. if defendant always hugged like that, because she was confused about what had happened, but ultimately did not do so because she was scared. She did not tell her family about what happened until 2015, when she "couldn't keep it in any longer." She waited until 2021 to speak to the police because she was tired of feeling sad around Christmastime. The last time V.K. saw defendant was when he visited V.K.'s family in 2013.

¶ 20 On cross-examination, V.K. was asked about portions of the police report she submitted to the Buffalo Grove police in 2021 relating to the death of her aunt. The report indicated that defendant caused a car crash by making an illegal U-turn on a Japanese highway which resulted in her death. The portion about the cause of the accident being an illegal U-turn was handwritten, and V.K. stated that the handwriting was her father's. V.K. explained that the report she submitted to police was originally drafted as a therapy exercise in 2016 or 2017. She later modified the draft by removing portions regarding her feelings about what had happened and supplementing the report with an explanation of her family history, which her parents helped her with. V.K. clarified that in 2011, she knew that her aunt had died in a car crash in which defendant had been driving, but she did not know that he had been at fault.

¶ 21    During V.K.'s testimony, five photographs from the 2011 Christmas party were introduced into evidence. Three of the photographs were from the first day of the party: one showed V.K. and her family, another showed defendant and his family, and there was a photo of seven men which included defendant, V.K.'s father, V.K.'s uncle, and other family friends. Two photographs were from the second day of the party: one showed all the children sitting on a couch with V.K. sitting with one of her legs pulled up against her chest, her hand on her knee, covering her mouth; and the other showed defendant and V.K.'s father smiling while partnered together in a game of charades.

¶ 22    R.S. testified as follows. She was 30 years old and lived in San Francisco. In 2003, she was 11 years old and lived in an apartment in New Jersey with her parents and sister. Around Christmas 2003, defendant, who was a college friend of R.S.'s father, and his family came to visit. R.S. had known defendant prior to his visit, as their families had gone on vacations together. Defendant and his family stayed at R.S.'s family's apartment for a week. During that time, the two families visited New York City along with the family of another college friend. Three photographs from the New York trip were admitted into evidence.

¶ 23    On the last day of defendant's visit, R.S. recalled that her father had decided to have a video call with some of his other college friends on the computer. The computer was in the master bedroom, and everyone had congregated around the computer for the call. R.S.'s father was operating the computer. R.S. was standing behind her father and defendant was standing behind her. R.S. testified that "[defendant] started to put his hand up my shirt and then he started to grope me. *** His hand went up the front of my shirt under my shirt." Defendant then placed his hand first above, then inside her training bra and began groping her right breast. R.S. froze and did not say or do anything in response. R.S. then turned to walk away and left to go into the living room.

At that point R.S.'s mother and defendant's wife had left the bedroom and were in the living room. R.S. felt "frozen, paralyzed, and scared." R.S. eventually went back to the master bedroom and stood near the doorway. Everyone else was still on the video call. Defendant then turned to R.S. and told her to come and join them and she did so. Defendant then proceeded to grope R.S.'s left breast, with his hand under her training bra. The video call eventually ended at which point defendant withdrew his hand.

¶ 24    R.S. had not known defendant to do or say anything unusual prior to the incident and never saw defendant again following the incident.

¶ 25    Initially, R.S. did not say anything, only telling her parents years later. R.S. found out through her family that defendant had been arrested in the instant case, and reached out to the State's Attorney's office to see if she could help.

¶ 26    Following R.S.'s testimony, the State rested, and defendant moved for a directed finding, which was denied. The defense then rested. The trial court found defendant guilty, indicating that it found both witnesses' testimony to be credible, emphasizing the similarity of the two accounts and the fact that R.S. and V.K. were otherwise unconnected to one another.

¶ 27                                    D. Posttrial Motions

¶ 28    Following the trial, defendant's trial counsel, Michael D. Cheronis, withdrew from representation. Defendant retained new counsel, who filed a motion for a new trial. In his motion for new trial, defendant argued, *inter alia*, that he was denied due process and received ineffective assistance of counsel because Cheronis had repeatedly told defendant that he would not allow him to testify on his own behalf, despite defendant communicating his desire to do so multiple times. Defendant likewise argued that Cheronis had been ineffective for failing to call defendant to testify regarding alibis for the abuse of R.S. and V.K., and to the motives of V.K. to fabricate her

allegations against defendant. Additionally, defendant argued that, subsequent to trial, "new evidence" was discovered that the videoconferencing technology that R.S. testified about "did not exist in 2003." In support, defendant attached the affidavit of defendant's retained expert, Peter Kent.

¶ 29     A hearing was held on defendant's motion for a new trial on November 15, 2024. At the hearing, defendant, Cheronis, and Kent were called to testify.

¶ 30                               1. Defendant's Right to Testify

¶ 31     Regarding whether Cheronis told defendant he would not allow him to testify, defendant testified that he first learned of the charges against him in October 2022. He retained Cheronis to represent him. At the time, defendant was living in the United Arab Emirates. Cheronis informed defendant that because there was no extradition treaty between the United Arab Emirates and the United States, there was no risk that defendant would be extradited to face the charges. Defendant told Cheronis that despite the lack of an extradition treaty, he wished to speak up and prove his innocence in court. Defendant told Cheronis multiple times that he wished to testify. He estimated he told Cheronis between 10 and 12 times of his desire to testify. On June 28, 2023, defendant sent Cheronis an email listing the pros and cons of his testifying, with there being no cons. At no point prior to June 28, 2023, did Cheronis tell defendant that he had the right to testify. Around July 26 or 27, 2023, a week before trial, defendant had a Zoom call with Cheronis. Defendant expressed that he wished to testify and Cheronis told him that he does not change his strategy a week before trial.

¶ 32     Defendant sent Cheronis a text message around 1 a.m. on August 1, 2023. In that text defendant explained what he would testify to if Cheronis would "allow" him to testify. Defendant testified that he used the word "allow" in the text message, because in his previous discussions

Cheronis had said, "I won't put you on the stand." Defendant then texted Cheronis again, asking him to consider allowing him to testify. Defendant also sent Cheronis an email saying that if he had not received his text messages, please allow him to testify. Defendant did not receive a response to these messages. Defendant then met with Cheronis prior to trial and asked about the messages. Cheronis told him that he had seen the messages and had replied, no. Defendant checked his messages, and he had not received a response. During witness testimony at trial, defendant gave Cheronis a note saying, "I testify." Defendant then spoke with Cheronis during the lunch break about testifying and Cheronis told him, "that is not how this works."

¶ 33   After the trial, defendant asked Cheronis to include his request to testify as part of his posttrial motion. Cheronis told him he would not do that, and defendant would need to hire a new attorney if he wanted to argue that. On August 9, 2023, defendant met with his new counsel, who explained that he had a right to testify. Defendant testified that he was shocked to learn this.

¶ 34   Cheronis testified that he had several conversations with defendant regarding his right to testify. Cheronis stated that he had "absolutely not" told defendant that he would not allow him to testify. He had consistently told defendant that "his right to testify was his own" and that if he testified it would be against Cheronis's advice.

¶ 35   Cheronis read from his cellphone into the record a text conversation between himself and defendant. On August 1, the day before the trial, at 6:04 a.m., defendant had reached out to Cheronis regarding testifying, and Cheronis responded as follows at 6:30 a.m.: "The decision to testify in your own defense is yours alone. My advice is it would be reckless and dangerous to put you on the stand without any preparation, not to mention that you don't have any real understanding of what you can or cannot say on the stand. If you chose to, it is against my advice."

¶ 36     Cheronis re-sent the message at 8:07 a.m. after defendant indicated that he had not received the 6:30 a.m. text. Defendant did not respond to either message, but Cheronis testified that he and defendant spoke about defendant testifying before the trial and during a break in the trial. Cheronis again told him that it was his right to testify, but that it would be against his advice, and defendant ultimately decided not to testify.

¶ 37                 2. Defendant's Purported Alibis and the Victims' Motives

¶ 38     Defendant testified that, had he been called to testify at trial, he would have denied staying at V.K.'s house the night of the alleged abuse. Instead, defendant and his son had stayed at V.K.'s father's older brother's house,[1] which was within walking distance. Further defendant would have testified that he stayed at a friend named Manni's house in 2003 instead of with R.S.'s family. Additionally, defendant stated that there were "multiple instances" between 2011 and 2021 between V.K.'s family and himself which would give rise to a motive to fabricate the allegations against him. Defendant claimed to have documentation and to have communicated all these matters to Cheronis.

¶ 39     On cross-examination, defendant specified that he had a 2009 post from a blog operated by his ex-wife mentioning that defendant stayed at another friend's house in 2003, including a picture.

¶ 40     On examination by the court, defendant testified that he had provided Cheronis with three names and an approximate location of the home, regarding the 2003 alibi. He did not provide phone numbers, stating that one of the men had "went back to India for good." He also did not provide email contact information stating, "[n]o, I don't have that close contact with them now." When asked if he had provided Cheronis with any information that would allow him to speak with

_____

[1]It is not clear if this is the same brother who hosted the Christmas party.

or contact any possible witnesses to the 2003 visit, defendant responded that he had not.

¶ 41    Regarding the proposed alibi for the abuse of V.K., defendant stated that along with himself, three or four other families stayed at the home. However, defendant testified that he either did not know who the families were or they were family members of V.K. Defendant also testified that he had told Cheronis about staying at the brother's home but "I didn't elaborate with him because those people were on opposite sides to me. I stayed at the older brother's house, he was against me in multiple instances between 2011 and 2021. They are not my friends anymore. I cannot call them."

¶ 42    Cheronis testified that, regarding the defendant's claimed alibis, he and defendant had several conversations about pursuing investigations and hiring a private investigator, but defendant ultimately chose not to do so.

¶ 43    Regarding the purported 2003 alibi, it was Cheronis's assessment that defendant's testimony would not constitute an alibi, but it might potentially impeach R.S. as to whether defendant spent the night at the apartment. However, R.S.'s allegations had nothing to do with whether defendant had spent the night in the house. Further, defendant had not provided any corroborating witnesses.

¶ 44    Regarding the 2011 alibi, it was Cheronis's recollection that defendant had advised him that there may have been other people staying in V.K.'s home that night. However, defendant either did not know those people, or they were family members of V.K. who would "likely not be supportive of his version of the events[.]" Therefore, there was no way to substantiate the defendant's claim.

¶ 45            3. Availability of Video Conferencing Technology in Late 2003

¶ 46    At the hearing defendant called Peter Kent as a witness. Kent testified that he worked as an e-commerce consultant and had written numerous books on internet technology. Kent testified that he had been working with computer technology as early as 1979, was working "online" in 1984, and started working on the internet in 1993. Kent testified that in his opinion it would have been "highly unlikely" that the video conferencing technology testified to by R.S. "would be available to an ordinary consumer." Kent based this opinion on the fact that he had used online technology for nearly 20 years by 2003 and that "[i]f it had been available [he] would probably have been using it." Kent testified that such technology had been available since before 2000 in a corporate setting, but that home internet speeds made it very difficult to use video on the internet at that time.

¶ 47    On cross-examination, Kent testified that it was not impossible that a home computer could have video conferencing technology in December 2003, but rather, in his opinion, it was very unlikely.

¶ 48    The trial court ultimately denied defendant's motion for retrial and, regarding the matter of defendant's right to testify, stated: "I am thoroughly convinced that Counsel discussed it on many occasions in many forms, *** to the extent that this defendant absolutely understood it was his right and his choice to determine whether he would testify. I think that is fully supported in the record." The trial court emphasized that the text message "put to rest" any concern that defendant had a lack of understanding of his right to testify.

¶ 49    Regarding Kent's testimony, the trial court did not find it "particularly illuminating or helpful," concluding that it amounted to "just one man's opinion on something he really had no very direct memory or experience with." The court ultimately concluded that it was "without question that the technology existed" and there was no basis to grant a new trial.

¶ 50    On December 19, 2023, defendant was sentenced to 180 days in jail, 36 months' probation, and required to register as a sexual predator.

¶ 51    Defendant timely appealed.

¶ 52                                    II. ANALYSIS

¶ 53    On appeal, defendant argues that there was insufficient evidence to find him guilty beyond a reasonable doubt, that the trial court erred in admitting R.S.'s testimony, that he received ineffective assistance of counsel, and that the cumulative errors deprived him of a fair trial.

¶ 54              A. There was Sufficient Evidence to Find Defendant Guilty

¶ 55    "When presented with a challenge to the sufficiency of the State's evidence, a reviewing court must determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 56    Defendant argues that we should reverse the trial court's finding of guilt based on the "improbability" of the incidents described by V.K. and R.S., discrepancies in V.K.'s statements, the length of time between the incidents and the outcries of V.K. and R.S., and because V.K. and her family were motivated to lie about defendant because they blamed him for the death of V.K.'s aunt.

¶ 57    Defendant argues that it is incredible that he would have fondled V.K.'s breasts while there were so many people around, and that V.K. did not speak, react, move, push away or scream for 5 to 15 minutes while her family was nearby. He likewise maintains that it is incredible that V.K. did not tell her family about what happened, even though they were all in the house.

¶ 58    Regarding the testimony of R.S., defendant argues that it is likewise incredible that

defendant would abuse R.S. while in close proximity to so many other people, including her father, and while in view of the people on the video call. Likewise, defendant maintains that it is incredible that R.S. did not cry out at the time or tell her mother when she went to the other room. Defendant maintains that it is even more incredible that R.S. would return to where defendant was to be abused again.

¶ 59    Defendant also points to discrepancies in V.K.'s recounting of events. V.K. testified on direct examination that the first time she disclosed what had happened was to her family in late 2015, then to her friend in 2016. But on cross-examination V.K. stated that she had told her friend before her family. Further, regarding the length of the incident, V.K.'s typed report to the police gave the length as 5-7 minutes, whereas in her interview with the police she stated it lasted between 8-15 minutes, and at trial she testified that it lasted for 5-10 minutes. Regarding the date of the offense, V.K.'s written report stated that the incident took place on December 25, whereas V.K.'s testimony was that it occurred on December 23, the evening of the first day of the party. Defendant maintains that this change in the date was made in order to allow the State to show the photograph from the second day of the party where V.K. was more withdrawn. Finally, V.K. told police that defendant had knocked on her door, whereas her testimony at trial was that he simply pushed the door open.

¶ 60    Defendant further argues that V.K. had a motive to fabricate her claims against defendant as her family held "deep-seated animosity" towards defendant for causing the death of V.K.'s aunt. Finally, defendant takes issue with the length of time between the alleged abuses and V.K. and R.S.'s outcries.

¶ 61    All of defendant's arguments go towards the credibility of V.K. and R.S. "Courts recognize that the trial judge, as the trier of fact, is in a superior position to the reviewing court to observe

the conduct of the witnesses while testifying, to determine their credibility, and to weigh and determine the preponderance of the evidence." *People v. Parcel of Property Commonly Known as 1945 N. 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 510 (2005). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 62    Regarding the general improbability of the scenarios at issue, defendant's conduct as described by V.K. and R.S—groping two pre-teen girls in their homes and in close proximity to their families—is certainly brazen. However, the similarities between the two accounts, along with the fact that V.K. and R.S. did not know one another, lends credence to their testimony.

¶ 63    Regarding the lack of a contemporaneous outcry, it is not unreasonable for victims of sexual assault to remain silent or even become paralyzed with fear. See, *e.g.*, *People v. Hunter*, 2023 IL App (4th) 210595, ¶ 41 (Twelve-year-old victim explained her reaction to being touched by defendant while watching a movie at church, "I was just sitting there because I was, like, frozen. I didn't know what to do."); *People v. Carlson*, 278 Ill. App. 3d 515, 521 (1996) (Thirty-year-old sexual assault victim testified, "I was frozen. I didn't know what to do. I was frozen. I couldn't move. I was terrified.").

¶ 64    Further, regarding the delay in contacting police, our legislature has recognized that minor victims of sexual assault often delay reaching out to police by extending the statute of limitations for the prosecution of such crimes over the years to the point where now a claim for aggravated criminal sexual abuse of a minor victim can be commenced at any time. See 720 ILCS 5/3-6(j) (West 2000-2024) (effective January 1, 2000, prosecutions for aggravated criminal sexual abuse could be brought within 10 years of the victim attaining the age of 18; effective July 24, 2003, within 20 years of the victim attaining the age of 18; effective January 1, 2014, at any time if

corroborated by physical evidence or a mandatory reporter failed to report the abuse; and finally effective August 11, 2017, at any time with no further requirements).

¶ 65    Further, the discrepancies and inconsistencies in V.K.'s testimony were not so egregious as to create a reasonable doubt as to her testimony that defendant groped her. "Where minor inconsistencies or discrepancies exist in a complainant's testimony but do not detract from the reasonableness of her story as a whole, the complainant's testimony may be found to be adequate to support a conviction for sexual abuse." *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992).

¶ 66    Regarding defendant's allegation that V.K.'s testimony was fabricated in order to enact vengeance against defendant for the death of V.K.'s aunt, there is little evidence to support defendant's claim. First, V.K.'s aunt died in 1998, either before V.K. was born or shortly thereafter. V.K. had not met defendant until she was 12 years old and met him on only one occasion after that. The notion that she would be personally motivated to level false charges against a man she barely knew based on his role in the death of an aunt whom she had never met and who had died over twenty years earlier lacks credibility. The notion that she would level charges against defendant on behalf of her father is likewise not credible. V.K.'s father let defendant and his family stay in his home, and the photos from the party appear to show them getting along. The idea that V.K.'s father would wait a further 12 years and then convince V.K. to falsely accuse defendant in order to avenge his sister's death more than twenty years after the fact is not reasonable. Finally, defendant's theory that V.K. falsely accused him to avenge her aunt does not explain R.S.'s testimony, as by all accounts she did not know V.K.'s family.

¶ 67    Finally, we turn to defendant's argument that V.K. and the prosecution conspired to change her testimony regarding the date of the alleged offense in order to use the photo of V.K. looking despondent against defendant. While it is perfectly fine to impeach V.K.'s testimony with the fact

that her initial statements gave a different date than the one she gave at trial, and even to speculate regarding why she changed her statement, defendant argues, "[i]t appears that State [*sic*] and V.K. felt compelled to move back the date of offense to be able to show the picture at trial." However, defendant has presented no evidence for his assertion that the prosecution conspired with V.K. in order to use the photograph at trial. We remind defense counsel of his obligations under Rule 8.2 of the Illinois Rules of Professional Conduct of 2010 (eff. Jan. 1, 2010) about making statements concerning the integrity of public legal officers with reckless disregard as to their truth or falsity. Such statements, when made without appropriate support, unduly erode public trust in our justice system.

¶ 68 Ultimately it was for the trial court to assess the witnesses' credibility, and their testimony was not so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. Accordingly, the trial court's guilty finding was not against the manifest weight of the evidence.

¶ 69 B. No Abuse of Discretion in Admitting Other Crimes Evidence

¶ 70 Defendant argues that the trial court erred in admitting R.S.'s testimony as other crimes evidence pursuant to section 115-7.3 of the Code. We review the trial court's decision to admit other crimes evidence for an abuse of discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). A trial court abuses its discretion where its decision is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Id.*

¶ 71 Section 115-7.3 allows for the admission of other crimes evidence to establish the propensity of defendant to commit the charged crime, if the requirements of the statute are met. It reads in pertinent part,

"(a) This Section applies to criminal cases in which:

(1) the defendant is accused of predatory criminal sexual assault of a child,

aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, criminal sexual abuse, child pornography, aggravated child pornography, criminal transmission of HIV, or child abduction as defined in paragraph (10) of subsection (b) of Section 10-5 of the Criminal Code of 1961 or the Criminal Code of 2012;

\* \* \*

(b) If the defendant is accused of an offense set forth in paragraph (1) or (2) of subsection (a)\*\*\*, evidence of the defendant's commission of another offense or offenses set forth in paragraph (1), (2), or (3) of subsection (a), or evidence to rebut that proof or an inference from that proof, may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." *Id.*

In the instant case, defendant was charged with aggravated criminal sexual abuse, and the other crimes evidence, which was admitted, though uncharged, likewise constituted aggravated criminal sexual abuse, and therefore was potentially admissible under section 115-7.3.

¶ 72    The question then becomes whether the prejudicial effect of the admitted evidence substantially outweighs the probative value. *Donoho*, 204 Ill. 2d at 183. The statute itself directs that the trial court may consider the following factors in weighing the prejudicial effect against the probative value of the evidence: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2022).

¶ 73    Defendant maintains that the other crimes evidence was too remote in time to be admissible. The charged conduct occurred around December 23, 2011, and the acts described in R.S.'s testimony occurred around December 2003, approximately eight years apart. Defendant

maintains that while there have been other instances where other crimes evidence occurring as long as 30 years prior to the charged conduct has been found to be admissible (see *People v. Lobdell*, 2017 Ill App. 3d. 150074), in the instant case, the events described by R.S. were so incredible that, coupled with the eight-year time difference, the evidence does not "survive the proximity test[.]"

¶ 74    Defendant likewise argues that the charged offense is too dissimilar from the other crimes evidence to support its admission, pointing to the fact that the abuse of V.K. occurred on the first day of defendant's visit whereas with R.S. it occurred on the last day; V.K. was alone in her room whereas R.S. was in a room with five or six other people; with V.K. the abuse occurred in a locked room whereas with R.S. the abuse occurred in an open room; with V.K. defendant told her he liked her artwork and that she resembled his deceased wife, whereas there was no conversation with R.S.; with V.K. defendant touched her back, breast, chest, and stomach, whereas he touched only R.S.'s breast; with V.K. the touching lasted for 8-15 minutes whereas with R.S. the touching lasted for a few seconds each time; it was V.K.'s first time meeting defendant, whereas R.S. had gone on family vacations with defendant's family; and finally, defendant was not in a position of trust or authority over V.K.

¶ 75    In short, defendant seeks to distinguish the two instances of abuse in a multitude of superficial and unimportant ways in an ineffective attempt to mask the fact that the two incidents were *remarkably* similar. R.S. and V.K. were 11 and 12 years old respectively at the time of the abuse. Defendant groped both of their breasts under their bras and shirts. Defendant was a guest in both of their homes for Christmas, and defendant occupied a similar role to each victim, uncle and family friend. And finally, the abuse was brazen in both instances, occurring in occupied homes with the girls' families nearby.

¶ 76    As for the proximity in time, defendant once again argues that the testimony of R.S. was incredible or improbable. As before we reject this assertion. While defendant's actions were undoubtedly brazen and foolhardy, the similarity of the two victim's accounts provides strong corroboration for each other's testimony, and the behavior of the victims is far from unheard of in instances of sexual abuse of children. Given the similarity of the two accounts, we reject defendant's claim that the eight-year span of time between the two occurrences renders R.S.'s testimony inadmissible.

¶ 77    Finally, defendant asserts that the trial court "never considered the unduly prejudicial nature of the proposed 'other act' " when it granted the State's motion *in limine*. We disagree. The trial court conducted a hearing on the admissibility of the proposed evidence, and denied the State's motion to admit the testimony of M.R., ruling that the nature of the abuse alleged by M.R. was too dissimilar and "extraordinarily more prejudicial" than that of R.S. This demonstrates that the trial court was properly aware of the factors to be considered and clearly considered the prejudicial effect of the proposed evidence.

¶ 78    Accordingly, the trial court did not abuse its discretion in admitting R.S.'s testimony as other crimes evidence under section 115-7.3.

¶ 79                    C. Trial Counsel was Not Ineffective

¶ 80    Defendant asserts that his trial counsel was ineffective in several ways: (1) depriving him of his right to testify, (2) failing to investigate potential alibi defenses and motive evidence, and (3) failing to present expert testimony to refute R.S.'s claim that defendant groped her during a video call.

¶ 81    To assert a claim of ineffective assistance of counsel, a defendant must establish that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A defendant must satisfy both prongs of the *Strickland* test, and a failure to satisfy either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 34. On appeal from a posttrial motion claiming ineffective assistance of counsel, "[w]e defer to the trial court's factual findings but review *de novo* whether counsel's omission supports an ineffective-assistance claim." *People v. Sharifpour*, 402 Ill. App. 3d 100, 116 (2010).

¶ 82                    1. Defendant was not Deprived of his Right to Testify

¶ 83    Defendant argues that at the time of trial, he was unaware that it was his right to decide whether to testify and not his attorney's decision. "The issue of whether the right to testify has been violated is raised by asserting the ineffective assistance of counsel." *People v. Whiting*, 365 Ill. App. 3d 402, 408 (2006). "As a general rule, advice not to testify is a matter of trial strategy that does not amount to ineffective assistance of counsel unless counsel refused to allow the defendant to testify." *People v. Knapp*, 2019 IL App (2d) 160162, ¶ 38.

¶ 84    Defendant maintains that he repeatedly asked Cheronis about testifying, including during trial. Defendant further argues that there is nothing in the record indicating that Cheronis consulted with defendant regarding testifying between moving for a directed finding and resting. Defendant further points to his asking to be "allowed" to testify as an indication that he believed that Cheronis was ultimately responsible for that decision.

¶ 85    The State maintains that the issue of whether defendant was denied his right to testify ultimately comes down to a credibility contest between defendant and Cheronis, who testified that he had repeatedly advised defendant regarding his right to testify but recommended against doing so.

¶ 86    We agree with the State that the issue of whether defendant waived his right to testify amounts to a credibility contest. "Because the trial court has heard the testimony, seen the witnesses, and had the opportunity to observe their demeanor, it is in the best position to judge the witnesses' credibility, determine the weight to be accorded their testimony, decide the inferences to be drawn from the evidence, and resolve any conflicts in the evidence." *People v. Frazier*, 248 Ill. App. 3d 6, 13 (1993).

¶ 87    Based on Cheronis's testimony, which was corroborated by the text messages presented at the hearing, we conclude that the trial court's determination that Cheronis had advised defendant regarding his right to testimony was reasonable. Accordingly, as trial counsel did not err in advising defendant regarding his right to testify on his own behalf, trial counsel was not ineffective in that regard.

¶ 88    2. Counsel's Decision Not to Investigate Motive and Alibi Evidence was Reasonable

¶ 89    Defendant argues that his trial counsel was ineffective for failing to investigate "alibi defenses" including that defendant did not stay at the victim's homes in 2003 and 2011. Likewise, defendant failed to investigate the "other motivations" R.S. had to testify. The State argues that defendant forfeited this argument because he did not raise it before the trial court, and instead raised the argument that trial counsel was ineffective for failing to call defendant to testify regarding defendant's alibi and motives of the alleged victim. In reply, defendant argues that the two are "closely linked" such that the argument was not forfeited. Regardless of any forfeiture, defendant's argument on this point is not convincing.

¶ 90    "Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002). "The failure to interview witnesses may indicate ineffective assistance of counsel particularly where the witness

was known to trial counsel and his testimony may have been exonerating." *People v. Smith*, 341 Ill. App. 3d 530, 544 (2003). However, "[c]ounsel has only a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary, and the reasonableness of a decision to investigate is assessed applying a heavy measure of deference to counsel's judgment." *People v. Orange*, 168 Ill. 2d 138, 149 (1995). To establish ineffective assistance of counsel, a defendant must overcome the strong presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689.

¶ 91    Regarding the potential alibi from 2003, defendant claims that a blog post written by his ex-wife in February 2009 mentioned staying at a different friend's house and had a picture of defendant staying at that house.

¶ 92    Cheronis testified that he had spoken with defendant regarding the matter, but that while the material could have potentially been used to impeach R.S. as to whether he spent the night at her home, it would not constitute an alibi, as the allegation had nothing to do with whether defendant had spent the night there.

¶ 93    Further, defendant testified that he did not know the address of where he had been staying and, although he gave Cheronis three names of the people he had stayed with, he did not give him their phone numbers or email contact, saying that he did not have "that close contact with them now" and that one had "went back to India for good."

¶ 94    We cannot say that Cheronis's failure to investigate or pursue the matter at trial constitutes ineffective assistance of counsel. We agree with Cheronis that the so-called alibi at best would have impeached R.S. on the detail of whether defendant had stayed the night at her home. Even if proven, this fact would not have precluded defendant's presence from the home altogether. Indeed, there was photographic evidence that defendant had visited with R.S.'s family in New York.

¶ 95    Further, short of calling defendant to testify himself, which presented its own risks, Cheronis would have needed to either call one of the people defendant had stayed with, whom he was no longer close to, or defendant's ex-wife regarding her blog. Given that she was no longer married to defendant and M.R. has since accused defendant of sexually assaulting her it is reasonable to presume that defendant's ex-wife would not have been a cooperative witness. In light of the strong presumption that counsel's decision not to investigate further could be considered sound trial strategy, defendant has failed to establish that Cheronis's representation fell below an objective standard of reasonableness.

¶ 96    Regarding 2011, defendant claimed that he had not stayed in V.K.'s home and instead he and his son stayed at the home of her father's older brother. Defendant testified that three or four families had stayed there that night and left the next morning. However, defendant either did not know the names of the people who had stayed there, or they were family of V.K. Defendant testified that, "[t]hey are not my friends anymore. I cannot call them." Cheronis testified that he had spoken about potentially hiring a private investigator to locate some of the people from the party, but defendant declined.

¶ 97    Defendant's 2011 alibi claim suffers from the same problem as his 2003 alibi claim in that it would not exclude defendant's presence at the victim's home. Further, there was no one who could substantiate defendant's claim, either because their identities were unknown or they were sympathetic to the victim. Again, we cannot say that trial counsel's decision not to investigate further fell below an objective standard of reasonableness. Defendant obviously presumed that the bare alibis he presented to counsel could have been testified to without any corroboration. That is not the case, as uncorroborated alibi testimony "carries no more weight than a simple denial." *People v. Butler*, 41 Ill. App. 3d 750, 752 (1976).

¶ 98   Finally, regarding defendant's claimed motivations for defendant to falsify her claims against him, defendant stated there were other motivations or disputes he could have testified to but went into no detail about what they were. Given that Cheronis cross-examined J.K. regarding whether her family blamed defendant for the death of her aunt and that the record contains no information regarding the nature of any other disputes, we cannot say that Cheronis was ineffective for failing to investigate these undisclosed additional motives.

¶ 99              3. Decision Not to Call Expert was Trial Strategy

¶ 100   Finally, we turn to defendant's claim that Cheronis was ineffective for failing to present expert testimony to refute R.S.'s testimony regarding the video call. The State correctly argues that defendant did not raise this ineffective assistance claim before the trial court, instead presenting Kent's opinion testimony as "newly discovered evidence." Regardless, Kent admitted that video conferencing technology existed at the time, despite opining that it would have been unlikely, but not impossible, for a home desktop computer in December 2003 or January 2004 to have been capable of video conferencing. Kent's opinion appears to have been based largely on his recollection of the time period with little concrete evidence to back up his opinion. Kent's testimony was hardly decisive and concerned only a collateral issue. The decision whether to introduce such evidence at trial falls squarely in the realm of trial strategy.

¶ 101   Accordingly, defendant has failed to establish that he received ineffective assistance of trial counsel.

¶ 102                       D. No Cumulative Error

¶ 103   Finally, defendant argues that the cumulative effects of the errors denied him a fair trial. However, as defendant has failed to establish any error, there can be no cumulative error.

¶ 104                          III. CONCLUSION

¶ 105   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 106   Affirmed.